# EXHIBIT A

# U.S. District Court
## Eastern District of New York (Central Islip)
## CIVIL DOCKET FOR CASE #: 2:11-cv-00831-JS -AKT

| | |
|---|---|
| Electrograph Systems, Inc. et al v. Hitachi Ltd. et al | Date Filed: 02/18/2011 |
| Assigned to: Judge Joanna Seybert | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge A. Kathleen Tomlinson | Nature of Suit: 410 Anti-Trust |
| | Jurisdiction: Federal Question |
| Cause: 15:1 Antitrust Litigation | |

**Plaintiff**

**Electrograph Systems, Inc.**          represented by **Benjamin Daniel Battles**
Boies, Schiller & Flexner LLP
10 North Pearl Street
Albany, NY 12207
518-434-0600
Fax: 518-434-0665
Email: bbattles@bsfllp.com
*ATTORNEY TO BE NOTICED*

**Philip J. Iovieno**
Boies, Schiller & Flexner LLP
10 North Pearl Street
4th Floor
Albany, NY 12207
518-434-0600
Fax: 518-434-0665
Email: piovieno@bsfllp.com
*ATTORNEY TO BE NOTICED*

**William A. Isaacson**
Boies, Schiller & Flexner LLP
5301 Wisconsin Ave., N.W.
Suite 800
Washington, DC 20015
202-237-2727
Fax: 202-237-6131
Email: wisaacson@bsfllp.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Electrograph Technologies**          represented by **Benjamin Daniel Battles**

**Corp.**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip J. Iovieno**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William A. Isaacson**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Hitachi Ltd.**

**Defendant**

**Hitachi Displays, LTD.**

**Defendant**

**Hitachi America, Ltd.**

**Defendant**

**Hitachi Asia, LTD.**

**Defendant**

**Hitachi Electronic Devices (USA)**

**Defendant**

**Shenzhen Seg Hitachi Color Display Devices, LTD.**

**Defendant**

**Daewoo International Corporation**
*TERMINATED: 03/10/2011*

**Defendant**

**Daewoo Electronics Corporation**
*TERMINATED: 03/10/2011*

**Defendant**

**Irico Group Corporation**

**Defendant**

**Irico Group Electronics Co.,
LTD.**

**Defendant**

**Irico Display Devices Co., LTD.**

**Defendant**

**LG Electronics, Inc.**

**Defendant**

**LG Electronics USA, Inc.**

**Defendant**

**LG ELectronics Taiwan Taipei
Co., LTD.**

**Defendant**

**LP Displays International, LTD.**

**Defendant**

**Panasonic Corporation**

**Defendant**

**Matsushita Electronic
Corporation (Malaysia) SDN
BHD**
*TERMINATED: 03/10/2011*

**Defendant**

**Panasonic Corporation of North
America**

**Defendant**

**Panasonic Consumer
Electronics Co.**
*TERMINATED: 03/10/2011*

**Defendant**

**Koninklijke Philips Electronics,**

**N.V.**

**<u>Defendant</u>**

**Philips Electronics Industries
LTD.**
*TERMINATED: 03/10/2011*

**<u>Defendant</u>**

**Philips Electronics North
America**

**<u>Defendant</u>**

**Philips Consumer Electronics
Co.**
*TERMINATED: 03/10/2011*

**<u>Defendant</u>**

**Philips Electronics Industries
(Taiwan), LTD.**

**<u>Defendant</u>**

**Philips Da Amazonia Industria
Electronica LTDA.**

**<u>Defendant</u>**

**Samsung Electronics Co., Ltd.**

**<u>Defendant</u>**

**Samsung Electronics America,
Inc.**

**<u>Defendant</u>**

**Samsung SDI (Malaysia) SDN
BHD**

**<u>Defendant</u>**

**Samsung SDI Co., LTD.**

**<u>Defendant</u>**

**Samsung SDI America, Inc.**

**<u>Defendant</u>**

**Samsung SDI Mexico S.A. DE**

**C.V.**

**Defendant**

**Samsung SDI Brasil LTDA**

**Defendant**

**Shenzhen Samsung SDI Co. LTD.**

**Defendant**

**Tianjin Samsung SDI Co., LTD.**

**Defendant**

**Samtel Color, LTD.**

**Defendant**

**Thai Crt Company, LTD.**

**Defendant**

**Toshiba Corporation**

**Defendant**

**Toshiba America, Inc.**

**Defendant**

**Toshiba America Consumer Products, LLC**
*TERMINATED: 03/10/2011*

**Defendant**

**Toshiba America Cosumer Products, Inc.**

**Defendant**

**Toshiba America Electronics Components, Inc.**

**Defendant**

**Toshiba America Information Systems, Inc.**

**Defendant**

**Toshiba Display Devices**

**(Thailand) Company, LTD.**
*TERMINATED: 03/10/2011*

**Defendant**

**MT Picture Display Co., LTD.**

**Defendant**

**Beijing Matsushita Color Crt Company, LTD.**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/18/2011 | 1 | COMPLAINT against Beijing Matsushita Color Crt Company, LTD., Daewoo Electronics Corporation, Daewoo International Corporation, Hitachi America, Ltd., Hitachi Asia, LTD., Hitachi Displays, LTD., Hitachi Electronic Devices (USA), Hitachi Ltd., Irico Display Devices Co., LTD., Irico Group Corporation, Irico Group Electronics Co., LTD., Koninklijke Philips Electronics, N.V., LG ELectronics Taiwan Taipei Co., LTD., LG Electronics USA, Inc., LG Electronics, Inc., LP Displays International, LTD., MT Picture Display Co., LTD., Matsushita Electronic Corporation (Malaysia) SDN BHD, Panasonic Consumer Electronics Co., Panasonic Corporation, Panasonic Corporation of North America, Philips Consumer Electronics Co., Philips Da Amazonia Industria Electronica LTDA., Philips Electronics Industries (Taiwan), LTD., Philips Electronics Industries LTD., Philips Electronics North America, Samsung Electronics America, Inc., Samsung Electronics Co., Ltd., Samsung SDI (Malaysia) SDN BHD, Samsung SDI America, Inc., Samsung SDI Brasil LTDA, Samsung SDI Co., LTD., Samsung SDI Mexico S.A. DE C.V., Samtel Color, LTD., Shenzhen Samsung SDI Co. LTD., Shenzhen Seg Hitachi Color Display Devices, LTD., Thai Crt Company, LTD., Tianjin Samsung SDI Co., LTD., Toshiba America Consumer Products, LLC, Toshiba America Cosumer Products, Inc., Toshiba America Electronics Components, Inc., Toshiba America Information Systems, Inc., Toshiba America, Inc., Toshiba Corporation, Toshiba Display Devices (Thailand) Company, LTD. Disclosure Statement on Civil Cover Sheet completed -Yes,, filed by Electrograph Systems, Inc., Electrograph Technologies Corp.. (Attachments: # 1 Civil Cover Sheet) (Major, Jasmine) (Entered: 02/23/2011) |
| 02/18/2011 | 2 | DISCLOSURE of Interested Parties by Electrograph Systems, Inc., Electrograph Technologies Corp.. (Major, Jasmine) (Entered: |

| | | |
|---|---|---|
| | | 02/23/2011) |
| 02/18/2011 | | Summons Issued as to Beijing Matsushita Color Crt Company, LTD., Daewoo Electronics Corporation, Daewoo International Corporation, Hitachi America, Ltd., Hitachi Asia, LTD., Hitachi Displays, LTD., Hitachi Electronic Devices (USA), Hitachi Ltd., Irico Display Devices Co., LTD., Irico Group Corporation, Irico Group Electronics Co., LTD., Koninklijke Philips Electronics, N.V., LG ELectronics Taiwan Taipei Co., LTD., LG Electronics USA, Inc., LG Electronics, Inc., LP Displays International, LTD., MT Picture Display Co., LTD., Matsushita Electronic Corporation (Malaysia) SDN BHD, Panasonic Consumer Electronics Co., Panasonic Corporation, Panasonic Corporation of North America, Philips Consumer Electronics Co., Philips Da Amazonia Industria Electronica LTDA., Philips Electronics Industries (Taiwan), LTD., Philips Electronics Industries LTD., Philips Electronics North America, Samsung Electronics America, Inc., Samsung Electronics Co., Ltd., Samsung SDI (Malaysia) SDN BHD, Samsung SDI America, Inc., Samsung SDI Brasil LTDA, Samsung SDI Co., LTD., Samsung SDI Mexico S.A. DE C.V., Samtel Color, LTD., Shenzhen Samsung SDI Co. LTD., Shenzhen Seg Hitachi Color Display Devices, LTD., Thai Crt Company, LTD., Tianjin Samsung SDI Co., LTD., Toshiba America Consumer Products, LLC, Toshiba America Cosumer Products, Inc., Toshiba America Electronics Components, Inc., Toshiba America Information Systems, Inc., Toshiba America, Inc., Toshiba Corporation, Toshiba Display Devices (Thailand) Company, LTD.. (Major, Jasmine) (Entered: 02/23/2011) |
| 02/18/2011 | | FILING FEE: $ 350, receipt number 4653025627 (Major, Jasmine) (Entered: 02/23/2011) |
| 02/24/2011 | | Case Ineligible for Arbitration (Bollbach, Jean) (Entered: 02/24/2011) |
| 03/03/2011 | 3 | MOTION for Leave to Appear Pro Hac Vice Pro Hac Vice *of William Isaacson* Filing fee $ 25, receipt number 0207-4657307. by Electrograph Systems, Inc., Electrograph Technologies Corp.. (Attachments: # 1 Affidavit of William Isaacson, # 2 Certificate of Good Standing, # 3 Proposed Order) (Iovieno, Philip) (Entered: 03/03/2011) |
| 03/03/2011 | 4 | MOTION for Leave to Appear Pro Hac Vice Pro Hac Vice *of Anne M. Nardacci* Filing fee $ 25, receipt number 0207-4657347. by Electrograph Systems, Inc., Electrograph Technologies Corp.. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Affidavit of Anne M. Nardacci, # 2 Certificate of Good Standing, # 3 Proposed Order) (Iovieno, Philip) (Entered: 03/03/2011) |
| 03/09/2011 | | ORDER denying 3 , 4 Motions for Leave to Appear pro hac vice, without prejudice, and with the right to renew. The moving affidavits in support of the motions for admission pro hac vice must be made by an attorney already admitted to practice in the Eastern District. Attorneys who are not admitted may not move their own admission. The motion may be re-submitted with an appropriate sponsoring affidavit for further action by the Court. The parties are directed to Rule 1.3(c) of the Local Civil Rules of the Eastern District of New York for guidance. Ordered by Magistrate Judge A. Kathleen Tomlinson on 3/9/2011. (Reifman, Marli) (Entered: 03/09/2011) |
| 03/10/2011 | 5 | AMENDED COMPLAINT against Beijing Matsushita Color Crt Company, LTD., Hitachi America, Ltd., Hitachi Asia, LTD., Hitachi Displays, LTD., Hitachi Electronic Devices (USA), Hitachi Ltd., Irico Display Devices Co., LTD., Irico Group Corporation, Irico Group Electronics Co., LTD., Koninklijke Philips Electronics, N.V., LG ELectronics Taiwan Taipei Co., LTD., LG Electronics USA, Inc., LG Electronics, Inc., LP Displays International, LTD., MT Picture Display Co., LTD., Panasonic Corporation, Panasonic Corporation of North America, Philips Da Amazonia Industria Electronica LTDA., Philips Electronics Industries (Taiwan), LTD., Philips Electronics North America, Samsung Electronics America, Inc., Samsung Electronics Co., Ltd., Samsung SDI (Malaysia) SDN BHD, Samsung SDI America, Inc., Samsung SDI Brasil LTDA, Samsung SDI Co., LTD., Samsung SDI Mexico S.A. DE C.V., Samtel Color, LTD., Shenzhen Samsung SDI Co. LTD., Shenzhen Seg Hitachi Color Display Devices, LTD., Thai Crt Company, LTD., Tianjin Samsung SDI Co., LTD., Toshiba America Consumer Products, LLC, Toshiba America Electronics Components, Inc., Toshiba America Information Systems, Inc., Toshiba America, Inc., Toshiba Corporation, filed by Electrograph Systems, Inc., Electrograph Technologies Corp.. (Iovieno, Philip) (Entered: 03/10/2011) |
| 03/11/2011 | | Amended Summons Issued as to Beijing Matsushita Color Crt Company, LTD., Hitachi America, Ltd., Hitachi Asia, LTD., Hitachi Displays, LTD., Hitachi Electronic Devices (USA), Hitachi Ltd., Irico Display Devices Co., LTD., Irico Group Corporation, Irico Group Electronics Co., LTD., Koninklijke Philips Electronics, N.V., |

LG ELectronics Taiwan Taipei Co., LTD., LG Electronics USA, Inc., LG Electronics, Inc., LP Displays International, LTD., MT Picture Display Co., LTD., Panasonic Corporation, Panasonic Corporation of North America, Philips Da Amazonia Industria Electronica LTDA., Philips Electronics Industries (Taiwan), LTD., Samsung Electronics America, Inc., Samsung Electronics Co., Ltd., Samsung SDI (Malaysia) SDN BHD, Samsung SDI America, Inc., Samsung SDI Brasil LTDA, Samsung SDI Co., LTD., Samsung SDI Mexico S.A. DE C.V., Samtel Color, LTD., Shenzhen Samsung SDI Co. LTD., Shenzhen Seg Hitachi Color Display Devices, LTD., Thai Crt Company, LTD., Tianjin Samsung SDI Co., LTD., Toshiba America Consumer Products, LLC, Toshiba America Electronics Components, Inc., Toshiba America Information Systems, Inc., Toshiba America, Inc., and Toshiba Corporation on 3/11/2011. (Misirlakis, Hariklia) (Entered: 03/11/2011)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/14/2011 16:43:15 | | | |
| **PACER Login:** | om0021 | **Client Code:** | 14578/0747430-00002 |
| **Description:** | Docket Report | **Search Criteria:** | 2:11-cv-00831-JS - AKT |
| **Billable Pages:** | 5 | **Cost:** | 0.40 |



**ORIGINAL**

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ FEB 18 2011 ★

**BROOKLYN OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ELECTROGRAPH SYSTEMS, INC.;
ELECTROGRAPH TECHNOLOGIES CORP.,

    Plaintiffs,

v.

HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI
AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI
ELECTRONIC DEVICES (USA); SHENZHEN SEG
HITACHI COLOR DISPLAY DEVICES, LTD.;
DAEWOO INTERNATIONAL CORPORATION;
DAEWOO ELECTRONICS CORPORATION; IRICO
GROUP CORPORATION; IRICO GROUP
ELECTRONICS CO., LTD.; IRICO DISPLAY DEVICES
CO., LTD.; LG ELECTRONICS, INC.; LG
ELECTRONICS USA, INC.; LG ELECTRONICS
TAIWAN TAIPEI CO., LTD.; LP DISPLAYS
INTERNATIONAL, LTD.; PANASONIC
CORPORATION; MATSUSHITA ELECTRONIC
CORPORATION (MALAYSIA) SDN BHD.;
PANASONIC CORPORATION OF NORTH AMERICA;
PANASONIC CONSUMER ELECTRONICS CO.;
KONINKLIJKE PHILIPS ELECTRONICS, N.V.;
PHILIPS ELECTRONICS INDUSTRIES LTD.; PHILIPS
ELECTRONICS NORTH AMERICA; PHILIPS
CONSUMER ELECTRONICS CO.; PHILIPS
ELECTRONICS INDUSTRIES (TAIWAN), LTD.;
PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA
LTDA.; SAMSUNG ELECTRONICS CO., LTD.;
SAMSUNG ELECTRONICS AMERICA, INC.;
SAMSUNG SDI (MALAYSIA) SDN BHD.; SAMSUNG
SDI CO., LTD.; SAMSUNG SDI AMERICA, INC.;
SAMSUNG SDI MEXICO S.A. DE C.V.;  SAMSUNG
SDI BRASIL LTDA.; SHENZHEN SAMSUNG SDI CO.
LTD.; TIANJIN SAMSUNG SDI CO., LTD.; SAMTEL
COLOR, LTD.; THAI CRT COMPANY, LTD.; TOSHIBA
CORPORATION; TOSHIBA AMERICA, INC.;
TOSHIBA AMERICA CONSUMER PRODUCTS LLC;
TOSHIBA AMERICA CONSUMER PRODUCTS, INC.;
TOSHIBA AMERICA ELECTRONIC COMPONENTS,
INC.; TOSHIBA AMERICA INFORMATION SYSTEMS,
INC.; TOSHIBA DISPLAY DEVICES (THAILAND)
COMPANY, LTD.; MT PICTURE DISPLAY CO., LTD.;
BEIJING MATSUSHITA COLOR CRT COMPANY,
LTD.,

    Defendants.

---

CASE NO. _____

CV 11 -0831

COMPLAINT

SUMMONS ISSUED

SEYBERT J

TOMLINSON, M.J.

Plaintiffs Electrograph Systems, Inc. and Electrograph Technologies Corp., for their Complaint against all Defendants named herein, hereby allege as follows:

## I.    INTRODUCTION

1.    Defendants and their co-conspirators formed an international cartel which conducted a long-running conspiracy extending at a minimum from at least March 1, 1995 through at least November 25, 2007 (the "Relevant Period"). The purpose and effect of this conspiracy was to fix, raise, stabilize, and maintain prices for cathode ray tubes ("CRTs") and products containing CRTs.

2.    Defendants are or were among the leading manufacturers of: (a) color picture tubes ("CPTs"), which are CRTs used primarily in color televisions; (b) color display tubes ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors). For the purposes of this Complaint, CPTs of all sizes and the products containing them shall be referred to collectively as "CPT Products." Also for the purposes of this Complaint, CDTs of all sizes and the products containing them shall be referred to as "CDT Products." CDT Products and CPT Products shall be referred to collectively herein as "CRT Products."

3.    Defendants control the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue. During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

4.    Since the mid-1990s, the CRT industry faced significant economic pressures as customer preferences for other emerging technologies shrank profits and threatened the sustainability of the industry. In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain, and stabilize the price at which CRT Products were sold in the United States.

5.    With respect to CRT Products, Defendants or their agents agreed, *inter*

2

*alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia,* shipments, prices, production, and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

6.     The conspiracy concerning CRT Products commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period. Also beginning in 1995, the co-conspirators began to engage in informal group meetings. By 1997, these group meetings had become more formalized, as described in greater detail below. There were at least 500 conspiracy meetings during the Relevant Period, including hundreds of group meetings and hundreds of bilateral meetings. These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the U.K. and Europe. These meetings included representatives from the highest levels of the respective companies, as well as regional managers and others.

7.     During the Relevant Period, the conspiracy affected billions of dollars of commerce throughout the United States.

8.     This conspiracy is being investigated by the United States Department of Justice ("DOJ") and by multiple foreign competition authorities. Since February 10, 2009, federal indictments have been issued against six individuals in connection with Defendants' CRT price-fixing conspiracy.

9.     During the Relevant Period, Plaintiffs purchased CRT Products, both CRTs and products containing CRTs, in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. Plaintiffs thus suffered damages as a result of

Defendants' conspiracy, and bring this action to recover the overcharges paid for the CRT Products they purchased during the Relevant Period.

## II.    JURISDICTION AND VENUE

10.    Plaintiffs bring this action to obtain injunctive relief under Section 16 of the Clayton Act; and to recover damages, including treble damages under Section 4 of the Clayton Act, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.    Plaintiffs also bring this action pursuant to Section 16750(a) of the California Business and Professions Code, for injunctive relief and treble damages that Plaintiffs sustained due to Defendants' and their co-conspirators' violation of Section 16700 *et seq.* of the California Business and Professions Code (the "Cartwright Act"). Plaintiffs' claims are also brought pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from and an injunction against Defendants due to their violations of Section 17200 *et seq.* of the California Business and Professions Code (the "California Unfair Competition Act").

12.    Plaintiffs also bring this action pursuant to Section 340 of the New York General Business Law, for injunctive relief and treble damages that Plaintiffs sustained due to Defendants' and their co-conspirators' violation of Section 340 *et seq.* of the New York General Business Law (the "Donnelly Act"). Plaintiffs' claims are also brought pursuant to Section 349 of the New York General Business Law, to obtain restitution from and an injunction against Defendants due to their violations of Section 349 *et seq.* of the New York General Business Law (the "New York Unfair Competition Act").

13.    The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over Plaintiffs' claims under the Cartwright Act, the California Unfair Competition Act, the Donnelly Act, and the New York Unfair Competition Act under 28 U.S.C. § 1367. Plaintiffs' state law claims are related to their claims under Section 1 of the Sherman

Act and they form part of the same case or controversy.

14.    The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on Unites States domestic and import trade or commerce. This effect gives rise to Plaintiffs' antitrust claims. During the Relevant Period, Defendants' conspiracy affected the price of CRT Products purchased in the United States.

15.    The activities of Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have a direct and substantial effect on commerce in California and New York. In particular Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of CRT Products purchased in these states. These effects also give rise to Plaintiffs' antitrust claims. Plaintiffs maintained operations in these states during the Relevant Period.

16.    This court has jurisdiction over each Defendant named in this action under both Section 12 of the Clayton Act (15 U.S.C. § 22) and section 302 of the New York CPLR. Each Defendant conducts substantial business in New York as well as California. In addition, Defendants and their co-conspirators purposely availed themselves of the laws of the United States and the identified states insofar as they manufactured CRTs for sale in the United States, including New York and California, or which were incorporated into CRT Products Defendants and their co-conspirators knew would be sold to customers in the United States, including New York and California. Defendants' and their co-conspirators' conspiracy affected this commerce in CRT Products in the United States and in New York and California.

17.    Venue is proper in the Eastern District of New York under Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c) and (d) because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District. In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District.

Defendants and their co-conspirators knew that price-fixed CRT Products containing price-fixed CRTs would be sold and shipped into this District.

## III.   PARTIES

### A.   Plaintiffs

18.    Plaintiff Electrograph Systems, Inc. is a New York corporation with its principal place of business in New York. Through May 2009, Electrograph Systems, Inc. conducted business as a value-added wholesale distributor of display technology solutions, including CRT displays and components, rear screen projection TVs, projectors, and digital electronic products, primarily to resellers and system integrators. Electrograph Systems, Inc. specialized in display, audio, connectivity, and other complementary technologies for sale to commercial, retail and government customers.

19.    Plaintiff Electrograph Technologies Corp. is a New York corporation, with its principal place of business in New York. Electrograph Technologies Corp. owns 100% of the outstanding capital stock of Electrograph Systems, Inc.   In addition to its ownership of Electrograph Systems, Inc. and various other businesses, through May 2004, Electrograph Technologies Corp. conducted business as an information technology solutions provider that specialized in hardware and software procurement, display technology, custom networking, security, IP telephony, remote management, application development/e-commerce, storage, and enterprise and Internet solutions. Electrograph Technologies Corp. offered its customers single-source solutions customized to their information systems needs by integrating its analysis, design and implementation services with hardware, software, networking products and peripherals from leading vendors.

20.    During the Relevant Period, the Plaintiffs, and their predecessor entities described below, purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. As such, the Plaintiffs suffered injury as a result of Defendants' unlawful conduct. Throughout the Relevant Period, Plaintiffs, and their predecessor entities

described below, conducted a substantial amount of business in New York.

**B.      Plaintiffs' Corporate History**

21.      Electrograph Technologies Corp. was incorporated under the name Manchester Equipment Co., Inc. on August 21, 1973. The company's name was changed to Manchester Technologies, Inc. on February 1, 2001, and then subsequently changed to Electrograph Technologies Corp. on August 1, 2005. On August 1, 2005, upon consummation of a merger by and among Electrograph Holdings, Inc., a Delaware Corporation, CICE Acquisition Corp. ("merger sub"), a New York Corporation, and Manchester Technologies, Inc., the merger sub was merged with and into Manchester Technologies, Inc., and Manchester Technologies, Inc. became a wholly-owned subsidiary of Electrograph Holdings, Inc., and concurrently changed its name to Electrograph Technologies Corp. During the Relevant Period, Electrograph Technologies Corp., and its subsidiaries and affiliates, purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. As such, Electrograph Technologies Corp. suffered injury as a result of Defendants' unlawful conduct.

22.      Electrograph Systems, Inc. was incorporated under the name Electrograph Acquisitions, Inc. on April 10, 1997. On April 28, 1997, Manchester Equipment Co., Inc.—the predecessor to Electrograph Technologies Corp.—acquired the business of Electrograph Acquisitions, Inc. from Bitwise Designs, Inc. On April 29, 1997, Electrograph Acquisitions, Inc. changed its name to Electrograph Systems, Inc. During the Relevant Period, Electrograph Systems, Inc., and its subsidiaries and affiliates, purchased CRT Products in the United States and elsewhere directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. As such, Electrograph Systems, Inc. suffered injury as a result of Defendants' unlawful conduct.

23.      ActiveLight, Inc. was formed on April 16, 1998, as a Washington company with its principal place of business in the State of Washington. ActiveLight, Inc. was a

7

value-added wholesale distributor of display technology solutions and projectors to the professional, commercial and high-end consumer markets. During the Relevant Period, ActiveLight, Inc. purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. As such, ActiveLight, Inc. suffered injury as a result of Defendants' unlawful conduct.

24.    On February 21, 2006, Plaintiff, Electrograph Systems, Inc. acquired 100% of the outstanding stock of ActiveLight, Inc. From the acquisition date through March 2, 2008, ActiveLight, Inc. operated as a wholly-owned subsidiary of Electrograph Systems, Inc. On March 3, 2008, ActiveLight, Inc. was merged into Electrograph Systems, Inc.

25.    CineLight Corporation was formed on June 11, 2001, as a Washington company with its principal place of business in the State of Washington. CineLight Corporation was a value-added wholesale distributor of advanced display technology products and accessories to home theater designers and resellers. During the Relevant Period, CineLight Corporation purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. As such, CineLight Corporation suffered injury as a result of Defendants' unlawful conduct.

26.    On February 21, 2006, Electrograph Systems, Inc. acquired 100% of the outstanding stock of CineLight Corporation. From the date of the acquisition until July 2006, CineLight Corporation operated as a wholly-owned subsidiary of Electrograph Systems, Inc. In July 2006, CineLight Corporation was merged into ActiveLight, Inc.

27.    International Computer Graphics, Inc. was formed on April 18, 1985, as a California company with its principal place of business in California. International Computer Graphics, Inc. conducted business as a specialty wholesale distributor of CRT, LCD, plasma and desktop displays, digital imaging peripherals and AV presentation products. During the Relevant Period, International Computer Graphics, Inc. purchased CRT Products directly and indirectly

8

from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. As such, International Computer Graphics, Inc. suffered injury as a result of Defendants' unlawful conduct.

28. On June 16, 2006, Electrograph Systems, Inc. acquired 100% of the outstanding stock of International Computer Graphics, Inc. From the date of the acquisition through March 2, 2008, International Computer Graphics, Inc. operated as a wholly-owned subsidiary of Electrograph Systems, Inc. On March 3, 2008, International Computer Graphics, Inc. was merged into Electrograph Systems, Inc.

29. Champion Vision, Inc. was formed on June 19, 2003, as a New York company with its principal place of business in New York. During the Relevant Period, Champion Vision, Inc. purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. As such, Champion Vision, Inc. suffered injury as a result of Defendants' unlawful conduct.

30. On September 15, 2008, Champion Vision, Inc. was merged into Electrograph Systems, Inc.

31. Coastal Office Products, Inc. was formed in 1987 as a Maryland corporation with its principal place of business in Maryland. On January 6, 1998, Coastal Office Products, Inc. was acquired by and became a wholly owned subsidiary of Manchester Equipment Co., Inc., the predecessor to Electrograph Technologies Corp. Coastal Office Products, Inc. was a reseller and provider of microcomputer services and peripherals to companies in the greater Baltimore, Maryland area. During the Relevant Period, Coastal Office Products, Inc. purchased CRT Products directly and indirectly from Defendants, and/or Defendants' subsidiaries and/or affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled. As such, Coastal Office Products, Inc. suffered injury as a result of Defendants' unlawful conduct. In 2008, Coastal Office Products, Inc. was merged into Electrograph Systems, Inc.

32. In 2008, Coastal Office Products, Inc. was merged into Electrograph

Systems, Inc.

33.    During the Relevant Period, Electrograph Systems, Inc. acquired all of the outstanding stock of ActiveLight, Inc., CineLight Corporation and International Computer Graphics, Inc. and formed Champion Vision, Inc. as a wholly-owned subsidiary.  In addition, during the Relevant Period, Electrograph Technologies Corp. acquired all of the outstanding stock of Coastal Office Products, Inc.  As such, the entities known as ActiveLight, Inc., CineLight Corporation, International Computer Graphics, Inc., Champion Vision, Inc. and Coastal Office Products, Inc. are herein referred to collectively as the "predecessor entities."  By acquiring the stock of companies that purchased CRT Products, Electrograph Systems, Inc. obtained all claims and rights under federal and state laws to recover any overcharges suffered by the predecessor entities.  Some of the predecessor entities were also merged into Electrograph Systems, Inc. and thus, Electrograph Systems, Inc. obtained all claims and rights under federal and state laws to recover any overcharges suffered by the predecessor entities.  As stated above, during the Relevant Period, these predecessor companies purchased CRT Products manufactured and sold by Defendants, their co-conspirators, and others.  As a result of Defendants' conspiracy, these predecessor entities were injured in their business and property because the prices they paid for CRT Products were artificially inflated by Defendants' conspiracy.  As used herein, any reference to either Electrograph Systems, Inc. or Electrograph Technologies Corp. includes any of the predecessor entities whose stock was acquired or obtained by either Electrograph Systems, Inc. or Electrograph Technologies Corp.

## C.    **Defendants**

### 1.    **Hitachi Entities**

34.    Defendant Hitachi, Ltd. is a Japanese company with its principal executive office at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Relevant Period, Hitachi, Ltd. manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or

10

affiliates throughout the United States.

35.    Defendant Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at AKS Building, 3 Kandaneribeicho 3, Chiyoda-ku, Tokyo, 101-0022, Japan.  Hitachi Displays, Ltd. was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays.  During the Relevant Period, Hitachi Displays sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

36.    Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business at 2000 Sierra Point Parkway, Brisbane, California. Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, Hitachi America sold and distributed CRT Products either directly (through, *inter alia,* its HED Home Electronics Division) or through its subsidiaries or affiliates (such as Hitachi Home Electronics (America), Inc. or Hitachi Sales Corporation of Hawaii, Inc.) throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi America relating to the antitrust violations alleged in this complaint.

37.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its principal place of business at 16 Collyer Quay, #20-00 Hitachi Tower, Singapore 049318.  Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Relevant Period, Hitachi Asia manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Asia relating to the antitrust violations alleged in this complaint.

11

38.    Defendant Hitachi Electronic Devices (USA) ("HEDUS") is a Delaware corporation with its principal place of business at 575 Mauldin Road Greenville, South Carolina 29607.  HEDUS is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.  During the Relevant Period, HEDUS manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Hitachi, Ltd. dominated and controlled the finances, policies and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

39.    Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") is a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Shenzhen is a wholly-owned and controlled subsidiary of Defendant Hitachi Displays.  During the Relevant Period, Hitachi Shenzhen manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendants Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

40.    Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, Hitachi Shenzhen and HEDUS are collectively referred to herein as "Hitachi."

### 2.    Daewoo Entities

41.    Defendant Daewoo International Corporation ("Daewoo International") is a corporation organized under the laws of Korea with its principal plaee of business located at 84-11 Namdaemunno 5-ga, Jung-gu, Seoul, Korea (100-753).  Daewoo International is a successor in interest to the Daewoo Group which was dismantled in or around 1999.  During the Relevant Period, Daewoo International manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

42.    Defendant Daewoo Electronics Corporation f/k/a Daewoo Electronics Company, Ltd. ("Daewoo Electronics") is a corporation organized under the laws of South Korea with its principal place of business located at 686 Ahyeon-dong, Mapagu, Seoul, South Korea.

12

Daewoo Electronics is a subsidiary of Daewoo International.  Plaintiffs are informed and believe that Daewoo Electronics was, along with Daewoo Telecom Company, Daewoo Corporation, and Orion Electric Components Company (all of whom were members of what is known as the "Daewoo Group"), a major shareholder of Orion Electric Company ("Orion"), a South Korean corporation that filed for bankruptcy in 2004.  During the Relevant Period, Orion was a major manufacturer of CRT Products.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Defendant Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  In December 1995, Orion partnered with Defendant Toshiba Corporation and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  During the Relevant Period, Daewoo Electronics manufactured, marketed, sold and/or distributed CRTs and/or CRT Products, either directly or through its subsidiaries or affiliates (specifically including Orion and DOSA), to customers throughout the United States.  Defendants Daewoo International and Daewoo Electronics dominated and controlled the policies and affairs of Orion and DOSA relating to the antitrust violations alleged in this complaint.

43.    Daewoo International, Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "Daewoo."

### 3.    Irico Entities

44.    Defendant Irico Group Corporation ("IGC") is a Chinese entity located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  Irico Group Corporation is the parent company for multiple subsidiaries engaged in the manufacture, distribution, and sale of CRT Products.  During the Relevant Period, Irico Group Corporation manufactured, sold, and

13

distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

45.    Defendant Irico Group Electronics Co., Ltd. ("IGE") is a Chinese entity located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGE is owned by IGC and engages in the manufacture, distribution, and sale of CRT Products. During the Relevant Period, IGE manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this complaint.

46.    Irico Display Devices Co., Ltd. ("IDDC") is a Chinese entity located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075. IDDC is a partially-owned subsidiary of Defendant IGC. In 2006, IDDC was China's top CRT maker. During the Relevant Period, IDDC manufactured, distributed, and sold CRT Products either directly or through its subsidiaries or affiliates or through other Defendants in the United States. Defendant IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this complaint.

47.    Defendants IGC, IGE, and IDDC are collectively referred to herein as "Irico."

#### 4.    LG Electronics Entities

48.    Defendant LG Electronics, Inc. ("LGEI") is a South Korean entity headquartered at LG Twin Towers 20, Yeouido-dong, Yeongdeungpo-gu, Seoul, South Korea 150-721. In 2001, LGEI entered into a joint venture with Defendant Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD"), in which the entities combined their CRT businesses. In 2002, LGEI had a 24.4 percent worldwide CRT market share. On April 1, 2007, LG.Philips Displays became an independent company and changed its name to LP Displays International, Ltd. During the Relevant Period, LGEI manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates (such as Zenith Electronics Corporation) throughout the United States.

14

49.      Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation with its principal place of business at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632. During the Relevant Period, LGEUSA manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

50.      Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located at 7F, No.47, Lane3, Jihu Road, NeiHu District, Taipei City, Taiwan. LGETT is a wholly-owned and controlled subsidiary of Defendant LG Electronics, Inc. During the Relevant Period, LGETT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant LGEI dominated and controlled the finances, policies and affairs of LGETT relating to the antitrust violations alleged in this complaint.

51.      Defendant LP Displays International, Ltd. ("LP Displays") is a Hong Kong company located at 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong. LP Displays is the successor entity to LGPD. During the Relevant Period, LP Displays manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

52.      Defendants LGEI, LGEUSA, LGETT, and LP Displays are referred to collectively herein as "LG Electronics."

### 5.      **Panasonic Entities**

53.      Defendant Panasonic Corporation, f/k/a Matsushita Electric Industrial Co, Ltd. ("MEI"), is a Japanese entity located at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. The entity known as MEI operated under that name until October 1, 2008 when it changed its name to Panasonic Corporation. In 2002, MEI entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs. MEI was the majority owner with 64.5 percent. On April 3, 2007, MEI

15

purchased the remaining 35.5 percent stake in the joint venture, making it a wholly-owned subsidiary of MEI. Panasonic Corporation is best known for its Panasonic brand, which in 2005 had the highest CRT revenue in Japan. During the Relevant Period, MEI sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

54.    Defendant Matsushita Electronic Corporation (Malaysia) Sdn Bhd. ("Matsushita Malaysia") is a Malaysian entity located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation (f/k/a MEI). During the Relevant Period, Matsushita Malaysia sold and distributed CRT Products manufactured by MEI either directly or through its subsidiaries or affiliates. Defendant Panasonic Corporation (f/k/a MEI) dominated and controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this complaint.

55.    Defendant Panasonic Corporation of North America ("PCNA") is a Delaware corporation with its principal place of business at One Panasonic Way, Secaucus, New Jersey 07094. PCNA is a wholly-owned and controlled subsidiary of Defendant Panasonic Corporation. During the Relevant Period, PCNA sold and distributed CRT Products either directly or through its subsidiaries or affiliates (such as Panasonic Digital Security & Imaging Co., Panasonic Logistics Co., Panasonic Broadcast & Television Systems Co., and Panasonic Company (West) of America) throughout the United States. Defendant Panasonic Corporation (f/k/a MEI) dominated and controlled the finances, policies and affairs of PCNA relating to the antitrust violations alleged in this complaint.

56.    Defendant Panasonic Consumer Electronics Co. ("PACEC") is a Delaware corporation with its principal place of business at One Panasonic Way, Secaucus, New Jersey 07094. PACEC is a wholly-owned and controlled subsidiary of Defendant PCNA. During the Relevant Period, PACEC sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Panasonic Corporation (f/k/a MEI) dominated and controlled the finances, policies and affairs of PACEC relating to the

16

antitrust violations alleged in this complaint.

57.    Defendants Panasonic Corporation (f/k/a MEI), Matsushita Malaysia, PCNA, and PACEC are collectively referred to herein as "Panasonic."

### 6.    Philips Entities

58.    Defendant Koninklijke Philips Electronics N.V. ("Royal Philips"), which translates to Royal Philips Electronics, is a Dutch entity with its principal place of business at Breitner Center, Amstelplein 2, 1096 BC Amsterdam, The Netherlands.  In 2000, Royal Philips was the leading global supplier of CRTs.  Royal Philips operated in Asia directly through divisions (such as Philips Components Asia and Philips BGTV) and through wholly-owned and separately incorporated subsidiaries.  In 2001, Royal Philips entered into a joint venture with Defendant LG Electronics called LG.Philips Displays ("LGPD"), in which the entities combined their CRT businesses.  LGPD operated in Asia and in Europe through its division LG.Philips Displays Europe Region.  On April 1, 2007, LG.Philips Displays became an independent company and changed its name to LP Displays International, Ltd.  During the Relevant Period, Royal Philips manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

59.    Defendant Philips Electronics Industries Ltd. ("PEIL") is a Taiwanese corporation with its principal place of business at 15F, 3-1 Yuanqu St., Nangang District, Taipei 115, Taiwan.  PEIL is a subsidiary of Defendant Royal Philips.  During the Relevant Period, PEIL sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of PEIL relating to the antitrust violations alleged in this complaint.

60.    Defendant Philips Electronics North America ("Philips America") is a Delaware corporation with its principal place of business at 1251 Avenue of the Americas, New York, New York, 10020.  Philips America is a subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips America sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Royal Philips

17

dominated and controlled the finances, policies and affairs of Philips America relating to the antitrust violations alleged in this complaint.

61.     Defendant Philips Consumer Electronics Co. ("PCEC") has its principal place of business at 64 Perimeter Center E, Atlanta, GA 30346-2295.  PCEC is a subsidiary of Defendant Royal Philips.  During the Relevant Period, PCEC sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of PCEC relating to the antitrust violations alleged in this complaint.

62.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Defendant Royal Philips. During the Relevant Period, Philips Taiwan sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Taiwan relating to the antitrust violations alleged in this complaint.

63.     Defendant Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manans, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned and controlled subsidiary of Defendant Royal Philips.  During the Relevant Period, Philips Brazil sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.  Defendant Royal Philips dominated and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations alleged in this complaint.

64.     Defendants Royal Philips, PEIL, PCEC, Philips America, Philips Taiwan and Philips Brazil are collectively referred to herein as "Philips."

7.      **Samsung Entities**

65.     Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean

company with its principal place of business at 250, 2-ga, Taepyong-ro, Jung-gu, Seoul 100-742, South Korea. It is South Korea's top electronics company. During the Relevant Period, SEC manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

66. Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660. SEAI is a wholly-owned and controlled subsidiary of Defendant SEC. During the Relevant Period, SEAI manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant SEC dominated and controlled the finances, policies and affairs of Samsung SEAI relating to the antitrust violations alleged in this complaint.

67. Defendant Samsung SDI (Malaysia) Sdn Bhd. ("Samsung Malaysia") is a Malaysian corporation with its principal place of business at Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia. Samsung Malaysia is a wholly-owned and controlled subsidiary of Defendant SEC. During the Relevant Period, Samsung Malaysia sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant SEC dominated and controlled the finances, policies and affairs of Samsung Malaysia relating to the antitrust violations alleged in this complaint.

68. Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company ("Samsung SDI") is a South Korean company with its principal place of business at 15th – 18th Floor, Samsung Life Insurance Building, 150, 2-ga, Taepyong-ro, Jung-gu, Seoul, 100-716, South Korea. Samsung SDI is a wholly-owned and controlled subsidiary of Defendant SEC. Samsung SDI is one of the largest CRT producers in the world. Samsung SDI was the top manufacturer for CRTs in 2000, with a market share of approximately 20%. During the Relevant Period, Samsung SDI manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant SEC dominated and

19

controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

69. Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation with its principal place of business at 3333 Michelson Drive, Suite 700, Irvine, California. Samsung America is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI America sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

70. Defendant Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 2314, Parque Industrial El Florido, Tijuana, B.C. Mexico. Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Mexico sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

71. Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil. Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Brazil sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this complaint.

72. Defendant Shenzhen Samsung SDI Co. Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu,

20

Shenzhen, China. Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Shenzhen sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this complaint.

73.     Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China. Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Defendant Samsung SDI. During the Relevant Period, Samsung SDI Tianjin sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendants SEC and Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this complaint.

74.     Defendants SEC, SEAI, Samsung Malaysia, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin are collectively referred to herein as "Samsung."

### 8.     Samtel

75.     Defendant Samtel Color, Ltd. ("Samtel") is an Indian company with its principal place of business at 52, Community Centre, New Friends Colony, New Delhi-110065. Samtel's market share for CPTs sold in India is approximately 40%, and it is that country's largest exporter of CPT Products. Samtel has gained safety approvals from the United States, Canada, Germany, and Great Britain for its CPT Products. During the Relevant Period, Samtel manufactured, sold, and distributed CPT Products throughout the United States.

### 9.     Thai CRT

76.     Defendant Thai CRT Company, Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand. Thai CRT is a

21

subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions. During the Relevant Period, Thai CRT manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

### 10.    Toshiba Entities

77.    Defendant Toshiba Corporation ("TC") is a Japanese company with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. In 2001, Toshiba held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors. In 2002, TC entered into a joint venture with Defendant MEI (now Panasonic Corporation) called Matsushita Toshiba Picture Display Co., Ltd., in which the entities consolidated their CRT businesses. During the Relevant Period, TC manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

78.    Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business at 1251 Avenue of the Americas, Suite 4110, New York, NY 10020. Toshiba America is a wholly-owned and controlled subsidiary of Defendant TC. During the Relevant Period, Toshiba America sold and distributed CRT Products either directly or through its subsidiaries or affiliates (such as Toshiba Hawaii, Inc.) throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of Toshiba America relating to the antitrust violations alleged in this complaint.

79.    Defendant Toshiba America Consumer Products LLC ("TACP") is a limited liability company that is headquartered at 82 Totawa Rd., Wayne, New Jersey 07470-3114. TACP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TACP sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust violations alleged in this complaint.

22

80.    Defendant Toshiba America Consumer Products, Inc. ("TACPI") is a company that is headquartered at 1420-B Toshiba Drive, Lebanon, Tennessee, 37087. TACPI is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TACPI sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TACPI relating to the antitrust violations alleged in this complaint.

81.    Defendant Toshiba America Electronic Components, Inc. ("TAEC") is headquartered at 9740 Irvine Blvd., Irvine, California 92718-1697. TAEP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TAEC sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

82.    Defendant Toshiba America Information Systems, Inc. ("TAIS") is headquartered at 9740 Irvine Blvd., Irvine, California 92718-1697. TAIP is a wholly-owned and controlled subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TAIS sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TAIS relating to the antitrust violations alleged in this complaint.

83.    Toshiba Display Devices (Thailand) Company, Ltd. ("TDDT") is a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000. TDDT is a wholly-owned and controlled subsidiary of Defendant TC. During the Relevant Period, TAIP sold and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant TC dominated and controlled the finances, policies and affairs of TAIP relating to the antitrust violations alleged in this complaint.

84.    Defendants TC, Toshiba America, TACP, TACPI, TAEC, TAIS and

23

TDDT are referred to collectively as "Toshiba."

### 11. __Joint Ventures__

85. Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese entity located at 1-1, Saiwai-cho,. Takatsuki-shi, Osaka 569-1193, Japan. MTPD was formed as a CRT joint venture between Defendants Panasonic Corporation (f/k/a MEI) and Toshiba. On April 3, 2007, Defendant MEI purchased the remaining stake in MTPD, making it a wholly-owned subsidiary. During the Relevant Period, MTPD manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

86. Defendant Beijing-Matsushita Color CRT Company, Ltd. ("BMCC") is a Chinese company with its principal place of business at No. 9 Jiuxianqiao N. Rd., Dashanzi Chao yang District, Beijing, China. BMCC is the second largest producer of CRTs for televisions in China. During the Relevant Period, BMCC manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

### IV. __AGENTS AND CO-CONSPIRATORS__

87. The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

88. Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs. Each Defendant that is a subsidiary of a foreign parent acts as the United States agent for CRTs or CRT Products made by its parent company.

89. Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof. Plaintiffs reserve the right to name some or all of these persons as Defendants at a later date.

90. The acts charged in this Complaint have been done by Defendants and

their co-conspirators, or were authorized, ordered, or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's or co-conspirator's business or affairs.

## V.    TRADE AND COMMERCE

91.    During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

92.    During the Relevant Period, Defendants collectively controlled a vast majority of the market for CRT Products, both globally and in the United States.

93.    The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States. The business activities of Defendants also substantially affected trade and commerce in California and New York and caused antitrust injuries in California and New York.

## VII.    FACTUAL ALLEGATIONS

### A.    CRT Technology

94.    A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image. A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image. An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

95.    CRT technology was first developed more than a century ago. The first commercially practical CRT television was made in 1931. However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to

consumers. After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors, and ATMs.

96. The quality of a CRT itself determines the quality of the CRT display. No external control or feature can make up for a poor quality tube. In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

97. Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

98. CRTs can be subdivided into CDTs and CPTs. As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices. The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

99. CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors. The demand for CRTs thus directly derives from the demand for such products.

100. The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets. The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

101. Plaintiffs have participated in the market for CRTs through their direct purchases from Defendants of CRTs and CRT Products and their purchases of CRT Products indirectly from non-Defendant original equipment manufacturers ("OEM") and others. Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs have bought CRTs and CRT Products, and Plaintiffs have been injured thereby and paid supra-competitive prices for CRTs and CRT Products.

102. Plaintiffs have participated in the market for products containing CRTs. To the extent Plaintiffs indirectly purchased CRTs as part of a CRT product, Defendants' and

their co-conspirators' unlawful conspiracy inflated the prices at which OEMs and others resold CRTs in these products. Plaintiffs were not able to pass the inflated prices on to their customers.

103.    Plaintiffs have been injured by paying supra-competitive prices for CRTs and CRT Products.

## B.    Structure of the CRT Industry

104.    The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces, and homogeneity of products.

### 1.    Market Concentration

105.    During the Relevant Period, the CRT industry was dominated by relatively few companies. In 2004, Defendants Samsung SDI, LGPD (n/k/a LP Displays), MTPD, as well as Chunghwa Picture Tubes, Ltd. ("Chunghwa"), together held a collective 78% share of the global CRT market. The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

### 2.    Information Sharing

106.    Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies, there were many opportunities for Defendants to discuss and exchange competitive information. The ease of communication was facilitated by the use of meetings, telephone calls, e-mails, and instant messages. Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for CRT Products as alleged below.

107.    Defendants Hitachi and Samsung, as well as Chunghwa are all members of the Society for Information Display. Defendants Samsung and LG Electronics are two of the co-founders of the Korea Display Industry Association. Similarly, Daewoo, LG Electronics, LP

27

Displays, and Samsung are members of the Electronic Display Industrial Research Association. Upon information and belief, Defendants used these trade associations as vehicles for discussing and agreeing upon their pricing for CRT Products. At the meetings of these trade associations, Defendants exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### 3. Consolidation

108. The CRT industry also had significant consolidation during the Relevant Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and MEI's CRT businesses into MTPD.

### 4. Multiple Interrelated Business Relationships

109. The industry is marked by a web of cross-licensing agreements, joint ventures, and other cooperative arrangements that can facilitate collusion.

110. Examples of the high degree of cooperation among Defendants in both the CRT Product market and other closely related markets include the following:

   a. The formation of the CRT joint venture LGPD in 2001 by Defendants LG Electronics and Philips.

   b. Defendants LG Electronics and Philips also formed LG.Philips LCD Co., Ltd. n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

   c. The formation of the CRT joint venture MTPD in 2003 by Defendants Toshiba and Panasonic.

   d. Defendants Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

   e. In December 1995, Defendants Daewoo and Toshiba partnered with two other non-Defendant entities to form TEDI which manufactured

28

CRTS in Indonesia.

f.  Defendants Daewoo and Toshiba also signed a cooperative agreement relating to LCDs in 1995. Pursuant to the agreement, Daewoo produced STN LCDs, and Toshiba, which had substituted its STN LCD production with TFT LCD production, marketed Daewoo's STN LCDs globally through its network.

g.  Also in 1995, Defendant Toshiba entered into a technology transfer agreement with Chunghwa for large CPTs.

h.  Chunghwa has a joint venture with Defendant Samsung for the production of LCD panels. Chunghwa now licenses the technology from Defendant Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i.  Defendants LG Electronics and Hitachi entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j.  Defendant Samtel participates in a joint venture, Samcor Glass Limited, with Defendant Samsung and non-Defendant Corning Inc., USA for the production and supply of picture tube glass.

k.  Defendant Samtel claims to have supplied CRTs to Defendants LG Electronics, Samsung, Philips, and Panasonic.

### 5.    **High Costs of Entry Into the Industry**

111.  There are significant manufacturing and technological barriers to entry into the CRT industry. It would require substantial time, resources and industry knowledge to overcome these barriers to entry. It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT Products.

112.  During the Relevant Period, the costs of the assembly components, both as a whole and individually, have been generally declining, and, in some periods, declining at a

substantial rate.   A combination of price discussions and manipulation of the output of CRT Products allowed Defendants to keep prices above where they would have been but for the conspiracy.

### 6.    The Maturity of the CRT Product Market

113.    Newer industries typically are characterized by rapid growth, innovation and high profits.  The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

114.    Demand for CRT Products was declining throughout the Relevant Period. Static declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

115.    In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and plasma displays.  This was one of the factors which led Defendants to engage in this alleged price fixing scheme in order to slow down declining CRT Product prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and are predicted to decline by an additional 84.5 percent between 2006 and 2010.

116.    Although demand was declining as a result of the popularity of flat-panel LCD and plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Relevant Period, making Defendants' collusion and the international price fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma display during the Relevant Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

117.    In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

118.    As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.

### 7.    Homogeneity of CRT Products

119.    CRT Products are commodity-like products which are manufactured in standardized sizes.  One Defendant's CRT Products for a particular application, such as a particular size television set or computer monitor, is substitutable for another's.  Defendants sell and Plaintiffs purchase CRT Products primarily on the basis of price.

120.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C.    Pre-Conspiracy Market

121.    The genesis of the CRT conspiracy was in the late 1980s as the CRT Products business became more international and Defendants began serving customers that were also being served by other international companies.  During this period, the employees of Defendants would encounter employees from their competitors when visiting their customers.  A culture of cooperation developed over the years and these Defendant employees would exchange market information on production, capacity, and customers.

122.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa and Orion visited each other's factories in S.E. Asia.  During this period, these producers began to include discussions about price in their meetings.

### D.    Defendants' and Co-Conspirators' Illegal Agreements

123.    In order to control and maintain profitability during declining demand for CRT Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRT Products to artificially inflated levels from at least March 1, 1995 through at least November 25, 2007.

124.    The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During

31

this period, representatives from Defendants LG Electronics, Samsung and Daewoo visited the other Defendant manufacturers including Philips, Thai CRT, Hitachi, Toshiba, and Panasonic to discuss increasing prices for CRT Products in general and to specific customers. These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia, and Singapore.

125.    Defendants Samsung, LG and Daewoo also attended several ad hoc group meetings during this period. The participants at these group meetings also discussed increasing prices for CRT Products.

126.    As more manufacturers formally entered the conspiracy, group meetings became more prevalent. Beginning in 1997, Defendants began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place. Defendants' representatives attended hundreds of these meetings during the Relevant Period.

127.    The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants charged for CRT Products.

### 1.    "Glass Meetings"

128.    The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM." Glass meetings were attended by employees at three general levels of Defendants' corporations.

129.    The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements. Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements. Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

130.    The second level meetings were attended by Defendants' high level sales managers and were known as "management" meetings. These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top

meetings.

131.    Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The working level meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

132.    The Chinese glass meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as Irico and BMCC, as well as the China-based branches of the other Defendants, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen and Samsung SDI Tianjin.

133.    Glass meetings also occurred occasionally in various European countries. Attendees at these meetings included those Defendants which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), and Irico. Chunghwa also attended these meetings.

134.    Representatives of Defendants also attended what were known amongst members of the conspiracy as "green meetings."  These were meetings held on golf courses.  The green meetings were generally attended by top and management level employees of Defendants.

135.    During the Relevant Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, and Malaysia.

136. Participants would often exchange competitively sensitive information prior to a glass meeting. This included information on inventories, production, sales and exports. For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

137. The glass meetings at all levels followed a fairly typical agenda. First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends, and forecasts of sales volumes for coming months. The participants also updated the information they had provided in the previous meeting. Each meeting had a rotating, designated "Chairman" who would write the information on a white board. The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter. They discussed and agreed upon target prices, price increases, so-called "bottom" prices, and price ranges for CRTs. They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers. Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

138. During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions. This was referred to as setting a "bottom price."

139. Defendants' conspiracy included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products, such as televisions and computer monitors. Defendants realized the importance of keeping the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs. In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

140. Each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of CRTs had on the cost of the finished products into which they

were placed. Like CRTs themselves, the market for CRT Products was a mature one, and there were slim profit margins. Defendants therefore concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers. In this way, Defendants ensured that price increases for CRTs were passed on to indirect purchasers of CRT Products.

141. The agreements reached at the glass meetings included:

a. agreements on CRT Product prices, including establishing target prices, "bottom" prices, price ranges, and price guidelines;

b. placing agreed-upon price differentials on various attributes of CRT Products, such as quality or certain technical specifications;

c. agreements on pricing for intra-company CRT Product sales to vertically integrated customers;

d. agreements as to what to tell customers about the reason for a price increase;

e. agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

f. agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

g. agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers demands;

h. agreements to coordinate uniform public statements regarding available capacity and supply;

i. agreements to allocate both overall market shares and share of a particular customer's purchases;

j. agreements to allocate customers;

      k.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

      l.   agreements to keep their meetings secret.

142.    Efforts were made to monitor each Defendant's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of Defendants themselves. When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

143.    As market conditions worsened in 2005-2007, and the rate of replacement of CRT Products by TFT-LCDs increased, the group glass meetings became less frequent and bilateral meetings again became more prevalent. In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

## 2.    **Bilateral Discussions**

144.    Throughout the Relevant Period, the glass meetings were supplemented by bilateral discussions between various Defendants. The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

145.    During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil and Mexico.

146.    The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations,

including Brazil, Mexico and Europe.

147.   In order to ensure the efficacy of their global conspiracy, Defendants also used bilateral meetings to coordinate pricing with CRT Product manufacturers in Brazil and Mexico, such as Philips Brazil, Samsung SDI Brazil, and Samsung SDI Mexico.  These Brazilian and Mexican manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Relevant Period.  Because these Brazilian and Mexican manufacturers are all wholly-owned and controlled subsidiaries of Defendants Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements.  In this way, Defendants ensured that prices of all CRT Products imported into the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

148.   Defendants also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

149.   Bilateral discussions were also used to coordinate prices with CRT Product manufacturers that did not ordinarily attend the group meetings, such as Defendants Hitachi, Toshiba, Panasonic, Thai CRT, and Samtel.  It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other Defendant manufacturers for the purpose of communicating whatever CRT Product pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT Product pricing agreements to Hitachi.  LG Electronics had a relationship with Toshiba and was responsible for communicating CRT Product pricing agreements to Toshiba.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT Product pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG Electronics, and Thai CRT.  Sometimes Hitachi and Toshiba also

attended the glass meetings. In this way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix prices of CRT Products.

### 3.    Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

150.    Between at least 1995 and 2007, Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen, and Samsung SDI Tianjin, participated in at least 200 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Samsung. Samsung also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, Samsung agreed on prices and supply levels for CRT Products.

151.    Defendants SEAI, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them. To the extent SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the glass meetings. Thus, SEAI, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

152.    Between at least 1995 and 2001, Defendant LG Electronics, through LGE and LGETT, participated in at least 100 glass meetings at all levels. After 2001, LG Electronics participated in the CRT Product conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by the highest ranking executives from LG Electronics. LG Electronics also engaged in bilateral discussions with each of the other Defendants on a regular basis. Through these discussions, LG agreed on prices and supply levels for CRT Products. LG Electronics never effectively withdrew from this conspiracy.

153.    Defendant LGEUSA was represented at those meetings and was a party to the agreements entered at them. To the extent LGEUSA sold and/or distributed CRT Products,

they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

154. Between at least 1996 and 2001, Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least 100 glass meetings at all levels. After 2001, Philips participated in the CRT Product conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP Displays). A substantial number of these meetings were attended by high level executives from Philips. Philips also engaged in numerous bilateral discussions with other Defendants. Through these discussions, Philips agreed on prices and supply levels for CRT Products. Philips never effectively withdrew from this conspiracy.

155. Defendants Philips America and Philips Brazil were represented at those meetings and were a party to the agreements entered at them. To the extent Philips America and Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus, Philips America and Philips Brazil were active, knowing participants in the alleged conspiracy.

156. Between at least 2001 and 2006, Defendant LP Displays (f/k/a LGPD) participated at least 100 glass meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from LP Displays. Certain of these high level executives from LP Displays had previously attended meetings on behalf of Defendants LG Electronics and Philips. LP Displays also engaged in bilateral discussions with other Defendants. Through these discussions, LP Displays agreed on prices and supply levels for CRT Products.

157. Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels. A substantial number

of these meetings were attended by the highest ranking executives from Daewoo. Daewoo also engaged in bilateral discussions with other Defendants on a regular basis. Through these discussions, Daewoo agreed on prices and supply levels for CRT Products. Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo never effectively withdrew from this conspiracy.

158. Between at least 1995 and 2003, Defendant Toshiba, through TC, TDDT and TEDI, participated in several glass meetings. After 2003, Toshiba participated in the CRT conspiracy through its joint venture with Panasonic, MTPD. These meetings were attended by high level sales managers from Toshiba and MTPD. Toshiba also engaged in multiple bilateral discussions with other Defendants, particularly with LG. Through these discussions, Toshiba agreed on prices and supply levels for CRT Products. Toshiba never effectively withdrew from this conspiracy.

159. Defendants Toshiba America, Inc., TACP, TAIS and TAEC were represented at those meetings and were a party to the agreements entered at them. To the extent Toshiba America, Inc., TACP, TAIS and TAEC sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus, Toshiba America, TACP, TAIS, and TAEC were active, knowing participants in the alleged conspiracy.

160. Between at least 1996 and 2001, Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen, and Hitachi Asia, participated in several glass meetings. These meetings were attended by high level sales managers from Hitachi. Hitachi also engaged in multiple bilateral discussions with other Defendants, particularly with Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRT Products. Hitachi never effectively withdrew from this conspiracy.

161. Defendants Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them. To the extent Hitachi America and

HEDUS sold and/or distributed CRT Products to direct purchasers, they played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

162.    Between at least 1996 and 2003, Defendant Panasonic (f/k/a MEI), through Panasonic Corporation and Matsushita Malaysia, participated in several glass meetings. After 2003, Panasonic participated in the CRT conspiracy through its joint venture with Toshiba, MTPD. These meetings were attended by high level sales managers from Panasonic and MTPD. Panasonic also engaged in multiple bilateral discussions with other Defendants. Through these discussions, Panasonic agreed on prices and supply levels for CRT Products. Panasonic never effectively withdrew from this conspiracy.

163.    PCNA was represented at those meetings and was a party to the agreements entered at them. To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played a significant role in the conspiracy because Defendants wished to ensure that the prices for CRT Products paid by direct purchasers would not undercut the pricing agreements reached at the glass meetings. Thus, PCNA was an active, knowing participant in the alleged conspiracy.

164.    Between at least 2003 and 2006, Defendant MTPD participated in multiple glass meetings and in fact led many of these meetings during the latter years of the conspiracy. These meetings were attended by high level sales managers from MTPD. MTPD also engaged in bilateral discussions with other Defendants. Through these discussions, MTPD agreed on prices and supply levels for CRT Products.

165.    Between at least 1998 and 2007, Defendant BMCC participated in multiple glass meetings. These meetings were attended by high level sales managers from BMCC. BMCC also engaged in multiple bilateral discussions with other Defendants, particularly the other Chinese CRT manufacturers. Through these discussions, BMCC agreed on prices and supply levels for CRT Products. None of BMCC's conspiratorial conduct in

41

connection with CRT Products was mandated by the Chinese government. BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

166.    Between at least 1998 and 2007, Defendant Irico, through IGC, IGE, and IDDC, participated in multiple glass meetings. These meetings were attended by the highest ranking executives from Irico. Irico also engaged in multiple bilateral discussions with other Defendants, particularly with other Chinese manufacturers. Through these discussions, Irico agreed on prices and supply levels for CRT Products. None of Irico's conspiratorial conduct in connection with CRT Products was mandated by the Chinese government. Irico was acting to further its own independent private interests in participating in the alleged conspiracy.

167.    Between at least 1997 and 2006, Defendant Thai CRT participated in multiple glass meetings. These meetings were attended by the highest ranking executives from Thai CRT. Thai CRT also engaged in multiple bilateral discussions with other Defendants, particularly with Samtel. Through these discussions, Thai CRT agreed on prices and supply levels for CRT Products. Thai CRT never effectively withdrew from this conspiracy.

168.    Between at least 1998 and 2006, Defendant Samtel participated in multiple bilateral discussions with other Defendants, particularly with Thai CRT. These meetings were attended by high level executives from Samtel. Through these discussions, Samtel agreed on prices and supply levels for CRT Products. Samtel never effectively withdrew from this conspiracy.

169.    When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in

42

meetings and discussions by their agents and were parties to the agreements reached in them.

### E.    The CRT Market During the Conspiracy

170.    Until the last few years, CRTs were the dominant technology used in displays, including televisions and computer monitors. During the Relevant Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

171.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|------|------|------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[1] | $235 |

172.    During the Relevant Period, North America was the largest market for CRT TVs and computer monitors. According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America. By 2002, North America still consumed around 35 percent of the world's CRT monitor supply. *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

173.    Defendants' collusion is evidenced by unusual price movements in the CRT Product market during the Relevant Period. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to

---

[1]    Estimated market value of CRT units sold.

about $50 in 1997." Information Display 9/92 p.19. Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

174.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years...."

175.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose. The price increase was allegedly based on increasing global demand. In fact, this price increase was a result of the collusive conduct as herein alleged.

176.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

177.    A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October....While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

178.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips, and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes. Philips is quoted as saying that, "It is expected that by the end of

September this year [2004] there will be 20% hike in the price of our CRT monitors."

179.    Defendants also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

180.    For example, Defendants' CRT factory utilization percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001. This is the most dramatic example of a drop in factory utilization. There were sudden drops throughout the Relevant Period but to a lesser degree. Plaintiffs are informed and believe that these sudden, coordinated drops in factory utilization by Defendants were the result of Defendants' agreements to decrease output in order to stabilize the prices of CRT Products.

181.    During the Relevant Period, while demand in the United States for CRT Products continued to decline, Defendants' conspiracy was effective in moderating the normal downward pressures on prices for CRT Products caused by the entry and popularity of the new generation LCD panels and plasma display products. As Finsen Yu, President of Skyworth Macao Commerical Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

182.    During the Relevant Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRT Products. These price increases were despite the declining demand due to the approaching obsolescence of CRT Products caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

183.    These price increases and price stability in the market for CRT Products during the Relevant Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

**F.    International Government Antitrust Investigations**

184.    Defendants' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRT Products sold in the United States during the Relevant Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ") and others in November 2007.

185.    On November 8, 2007, antitrust authorities in Europe, Japan and South Korea raided the offices of manufacturers of CRTs as part of an international investigation of alleged price fixing.

186.    Defendant MTPD, the CRT unit of Defendant Panasonic, has confirmed that it was raided by Japan's Fair Trade Commission.

187.    *Kyodo News* reported on November 8, 2007, upon information and belief, that MT Picture Display fixed prices for CRTs with manufacturers in three Asian countries, including South Korea's Samsung SDI. *Kyodo News* further reported that "[o]fficials of these three companies are believed to have had at least 10 meetings since 2005 in major Asian cities to coordinate target prices when delivering their products to TV manufacturers in Japan and South Korea, the sources said."

188.    Defendant Samsung SDI was raided by South Korea's Fair Trade Commission, which has started an investigation into Samsung's CRT business.

189.    The *Asian Shimbun* further reported on November 10, 2007 that "[t]he representatives held meetings in Southeast Asia where the companies operate CRT factories, the sources said. The European Commission, the European Union's executive branch, and the U.S. Justice Department have been investigating four companies' [referring to the four Asian-based manufacturers—MTPD, Samsung SDI, Chunghwa, and LP Displays] overseas units and are

closely consulting with the Fair Trade Commission by sharing information."

190.    On November 21, 2007, Defendant Royal Philips publicly disclosed that it too is subject to one or more investigations into anticompetitive conduct in the CRT industry. Royal Philips spokesman Joon Knapen declined to comment on which jurisdictions have started investigations. Royal Philips stated that it intended to assist the regulators.

191.    In its 2008 Annual Report, Defendant Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

192.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel. The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o., LP Displays, Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European HQ.
>
> Based on the data available the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured pictures tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.
>
> According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the

47

European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország. was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

193.    On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin, aka C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions. The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry." The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Lin's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

194.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had the previous night returned a one-count indictment against Wu Jen Cheng aka Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. Tony Cheng formerly was an assistant Vice-President of Sales and Marketing at Chunghwa. The press release notes that Cheng previously had been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

195.    On March 30, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against

48

Chung Cheng Yeh aka Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Yeh as a "former director of sales" at "a large-Taiwan based color display tube (CDT) manufacturer." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

196.    On November 9, 2010, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu Lee aka Simon Lee, Yeong-Ug Yang aka Albert Yang, and Jae-Sik Kim aka J.S. Kim for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors. The press release identifies Lee, Yang, and Kim as "former executives from two color display tube (CDT) manufacturing companies." The indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

197.    As outlined above, Defendants have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

198.    Several Defendants also have a history of "cooperation" and anticompetitive conduct. For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory ("DRAM").

199.    Defendants Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory ("SRAM") and NAND Flash Memory.

200.    In December 2006, government authorities in Japan, Korea, the European

Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

201.    On December 12, 2006, news reports indicated that Defendant Samsung and Chunghwa, as well as an LCD joint venture between Defendants Philips and LG Electronics, Inc, LG Display Co., Ltd., were all under investigation for price fixing of TFT-LCDs.

202.    On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation, and Chunghwa—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

203.    On March 10, 2009, the DOJ announced that it had reached an agreement with Defendant Hitachi Displays, a subsidiary of Defendant Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

204.    The indictments of LG Display Co., Ltd., Sharp Corporation, Chunghwa and Hitachi Displays, all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in the Northern District of California.

### G.    The Role of Trade Associations During the Relevant Period

205.    Defendants' collusive activities have been furthered by trade associations and trade events that provided opportunities to conspire and share information.  One example is the Korea Display Conference ("KDC"), hosted by DisplayBank and, since the summer of 2004, by KODEMIA, the Korean Display Equipment Material Industry Association.  KODEMIA is a national trade organization representing about 80 member companies in the Korean display

industry, including manufacturers and suppliers. Prior to the summer of 2004, the KDC had been hosted by EDIRAK, the Electronic Display Industrial Research Association of Korea. EDIRAK had a stated goal of "promoting co-activity with foreign Organizations related to display industries." Since 1996, EDIRAK had a cooperation pact with the United States Display Consortium ("USDC"). In describing that pact, Malcolm Thompson, then the Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

206.   Samsung and LG Electronics were members of both KODEMIA and EDIRAK, and have participated extensively in the KDCs.

207.   The KDC has taken place in Seoul, Korea or other Korean venues on: December 4, 2002; June 12, 2003; December 9-10, 2003; June 9-10, 2004; November 23-24,2004; November 3-4, 2005; July 6-7, 2006; and June 26-27, 2007. Top executives of Samsung's and LG Electronics' CRT operations have participated at these events, including H.K. Chung, Woo Jong Lee, Bae Choel-Han, Jung Ho-Gyun and H.C. Kim of Samsung and S.T. Kim, S. Trinker and Ney Corsino of LG Electronics. Executives of foreign companies also participated, such as Zenzou Tashima of Hitachi.

208.   Other opportunities to collude among Defendants were provided by events sponsored by the Society for Information Display, such as the annual Asian Symposiums on Information Display, the annual International Display Manufacturing Conference and Exhibition (the most recent one of which was held in Taipei, Taiwan), the annual International Meeting on Information Displays (held each August in Daegu, Korea) and the annual International Display Workshops (the most recent ones of which have been held in Japan).

209.   Through these trade association and trade events, and in meetings related to these trade associations and trade events, on information and belief, Defendants shared what

would normally be considered proprietary and competitively sensitive information. This exchange of information was used to implement and monitor the conspiracy.

### H.    Effects of Defendants' Antitrust Violations

#### 1.    Examples of Reductions in Manufacturing Capacity by Defendants

210.    As explained above, during the Relevant Period, Defendants consolidated their manufacturing facilities in lower-cost venues such as China and reduced manufacturing capacity to prop up prices.

211.    In December of 2004, MTPD closed its American subsidiary's operations in Horseheads, New York, citing price and market erosion. Panasonic announced that the closing was part of the company's "global restructuring initiatives in the CRT business." The company further stated that in the future, "CRTs for the North American market will be supplied by other manufacturing locations in order to establish an optimum CRT manufacturing structure."

212.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

213.    In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006. Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

214.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

52

215. In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana. The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

### 2.   Examples of Collusive Pricing for CRT Products

216. Defendants' collusion is evidenced by unusual price movements in the CRT market. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

217. In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

218. In reality, consumer prices for CRT Products never approached $50 in 1997, and were consistently more than double this price.

219. Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to conceal the conspiracy.

220. Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of 1998, which severely devalued Asian currencies. This prompted the keynote speaker at Asia Display 1998, an annual conference for the display industry, to state:

We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

221. In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants.

222. After experiencing an oversupply of 17-inch CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

223. On June 1, 2004, LG Electronics raised the prices of its 15-inch and 17-inch CRT monitors in India. This price hike was falsely attributed exclusively to a shortage of glass needed to manufacture CRTs.

224. Over the course of the conspiracy period, the price of CRTs remained stable, and in some instances went up in an unexplained manner, despite the natural trend in most technology products to go down over time. CRT technology was mature, and the costs of production were relatively low compared to other emerging technologies. As Finsen Yu, President of Skyworth Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of 2007, "[t]he CRT technology is very mature; prices and technology have become stable."

225. CRT prices resisted downward price pressures and remained stable over a period of many years. Even in periods of decreasing prices caused by outside factors, such as the Asian currency crisis, the prices of CRT Products did not decline as much as they would have

54

absent the conspiracy. The stability of the price of CRTs was accomplished by the collusive activities alleged above.

**H.   Summary Of The Effects Of The Conspiracy Involving CRT Products**

226.   The above combination and conspiracy has had the following effects, among others:

    a.   Price competition in the sale of CRT Products by Defendants and their co-conspirators has been restrained, suppressed and eliminated throughout the United States;

    b.   Prices for CRT Products sold by Defendants to Plaintiffs directly and indirectly have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

    c.   Plaintiffs have been deprived of the benefit of free and open competition in the purchase of CRT Products.

    d.   As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs have been injured in their business and property in that they paid more for CRT Products than they otherwise would have paid in the absence of the unlawful conduct of Defendants.

**VIII.   PLAINTIFFS' INJURIES**

227.   As purchasers of computer monitors, TVs and other devices that contained CRTs, Plaintiffs have suffered a direct, substantial and reasonably foreseeable injury as a result of Defendants' conspiracy to raise, fix, stabilize or maintain the price of CRT Products at supra-competitive levels. Defendants' conspiracy artificially inflated the price of CRT Products causing Plaintiffs to pay higher prices than they would have in the absence of Defendants' conspiracy.

228.   Plaintiffs also purchased CRT Products containing CRTs from OEMs as well as others, which in turn purchased CRTs from Defendants and their co-conspirators. Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these

OEMs and others, which paid higher prices for CRTs than they would have absent the conspiracy. The conspiracy artificially inflated the prices of CRTs included in CRT Products.

229.    The OEMs and others passed on to their customers, including Plaintiffs, the overcharges caused by Defendants' conspiracy. Plaintiffs were not able to pass on to their customers the overcharges caused by Defendants' conspiracy. Thus, Plaintiffs suffered injury when it purchased CRT Products containing such price-fixed CRTs from the OEMs and others.

230.    Once a CRT leaves its place of manufacture, it remains essentially unchanged as it moves through the distribution system. CRTs are identifiable, discrete physical objects that do not change form or become an indistinguishable part of a CRT Product. Thus, CRTs follow a physical chain from Defendants through manufacturers of CRT Products sold to Plaintiffs.

231.    The market for CRTs and the market for CRT Products are inextricably linked and cannot be considered separately. Defendants are well aware of this intimate relationship.

232.    Throughout the Relevant Period, Defendants controlled the market for CRTs. Consequently, during the Relevant Period, the OEMs had no choice but to purchase CRTs from Defendants and others at prices that were artificially inflated, fixed and stabilized by Defendants' conspiracy.

233.    As a result, Plaintiffs were injured in connection with their purchases of CRT Products during the Relevant Period.

## IX.    FRAUDULENT CONCEALMENT

234.    Plaintiffs had neither actual nor constructive knowledge of the facts supporting their claims for relief despite diligence in trying to discover the pertinent facts.

56

Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until November 2007, when investigations by the DOJ and other antitrust regulators became public. Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of CRT Products.

235.   Because Defendants' agreement, understanding and conspiracy was kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for CRT Products.

236.   The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection. As noted above, Defendants organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions. Defendants would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

237.   By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

238.   Plaintiffs and the Class members could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination. The contract, conspiracy or combination as herein alleged was fraudulently

57

concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the existence and nature of their competitor pricing discussions from non-conspirators (including customers).

239.   As alleged above, Defendants in mid-2000 began to hold CDT and CPT meetings at separate venues in order to avoid detection. Participants at glass meetings were also told not to take minutes. Attending companies also reduced the number of their respective attendees to maintain secrecy.

240.   Defendants also agreed at glass meetings and bilateral meetings to give pretextual reasons for price increases and output reductions to their customers.

241.   As alleged above, in early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large-sized color CRTs actually rose. The price increase was allegedly based on increasing global demand for the products. In fact, this price rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

242.   As alleged above, despite increased competition from flat panel monitors, prices for CRT monitors were stuck stubbornly at high price levels throughout 2001. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to cover up the conspiracy.

243.   In addition, when several CRT manufacturers, including Defendants Samsung, Philips, and LG Electronics, increased the price of CRT Products in 2004, the price hike was blamed on a shortage of glass shells use for manufacturing CRT monitors. In justifying

this price increase, a Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a global phenomena and every company has to increase the prices of CRT monitors in due course of time."

244.    Manufacturers such as LG Electronics periodically issued press statements falsely asserting that CRT prices were being driven lower by intense competition.

245.    Plaintiffs are informed and believe, and thereon allege, that Defendants' purported reasons for the price increases of CRT Products were materially false and misleading and made for the purpose of concealing Defendants' anti-competitive scheme as alleged herein.

246.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the Class members have as a result of the anticompetitive conduct alleged in this complaint.

## X.    CLAIM FOR VIOLATIONS

### First Claim for Relief
### (Violation of Section 1 of the Sherman Act)

247.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

248.    Beginning no later than March 1, 1995, the exact date being unknown to plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

249.    In particular, Defendants combined and conspired to raise, fix, maintain or stabilize the prices of CRT Products sold in the United States.

250.    As a result of Defendants' unlawful conduct, prices for CRT Products were raised, fixed, maintained and stabilized in the United States.

251.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

252.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.    participating in meetings and conversations to discuss the prices and supply of CRT Products;

    b.    communicating in writing and orally to fix target prices, floor prices, and price ranges for CRT Products;

    c.    agreeing to manipulate prices and supply of CRT Products sold in the United States in a manner that deprived direct purchasers of free and open competition;

    d.    issuing price announcements and price quotations in accordance with the agreements reached;

    e.    selling CRT Products to customers in the United States at noncompetitive prices;

    f.    exchanging competitively sensitive information in order to facilitate their conspiracy;

    g.    agreeing to maintain or lower production capacity; and

    h.    providing false statements to the public to explain increased prices for CRT Products.

253.    As a result of Defendants' unlawful conduct, Plaintiffs were injured in their businesses and property in that they paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

60

## Second Claim for Relief
## (Violation of the California Cartwright Act)

254. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

255. During the Relevant Period, Plaintiffs, and their predecessor entities, including International Computer Graphics, Inc., which was organized under the laws of the State of California, conducted a substantial volume of business in California. In particular, Plaintiffs purchased CRT Products from Defendants and their co-conspirators in California; maintained warehouses in California containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRT Products to customers in California and elsewhere. As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

256. In addition, Defendants LG Display, Samsung and Toshiba all maintained offices in California during the Relevant Period. Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement to fix the price of CRT Products. Defendants' conduct within California thus injured Plaintiffs and their predecessor entities, both in California and throughout the United States.

257. Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Cartwright Act, California Business and Professional Code Section 16720. Defendants have each acted in

61

violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for CRT Products at supra-competitive levels. Defendants' conduct substantially affected California commerce.

258.    The aforesaid violations of Section 16720, California Business and Professional Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, CRT Products.

259.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

    a.  to fix, raise, maintain and stabilize the price of CRT Products;

    b.  to allocated markets for CRT Products amongst themselves;

    c.  to submit rigged bids for the award and performance of certain CRT Products contracts; and

    d.  to allocate among themselves the production of CRT Products.

260.    The combination and conspiracy alleged herein has had, inter alia, the following effects:

    a.  price competition in the sale of CRT Products has been restrained, suppressed and/or eliminated in the State of California;

    b.  prices for CRT Products sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and

    c.  those who purchased CRT Products from Defendants, their co-conspirators, and others and CRT Products containing price-fixed

CRTs from Defendants, their co-conspirators, and others have been deprived of the benefit of free and open competition.

261.    As a result of the alleged conduct of Defendants, Plaintiffs paid supra-competitive, artificially inflated prices for the CRT Products they purchased during the Relevant Period.

262.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products containing price-fixed CRTs sold by Defendants, their co-conspirators, and others than they would have paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants' violation of Section 16720 of the California Business and Professional Code, Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

## Third Claim for Relief
### (Violation of California Unfair Competition Law)

263.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

264.    During the Relevant Period, Plaintiffs, and their predecessor entities, including International Computer Graphics, Inc., conducted a substantial volume of business in California.  In particular, Plaintiffs purchased CRT Products from Defendants and their co-conspirators in California; maintained warehouses in California containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in California who sold CRT Products to consumers in California and elsewhere.  As a result of their presence in California and the substantial business they conducted in California, Plaintiffs are entitled to the protection of the laws of California.

63

265.   Defendants have engaged in unfair competition in violation of California's Unfair Competition Law, California Business and Professional Code § 17200 *et seq.*

266.   Defendants committed acts of unfair competition, as defined by Section 17200, *et seq.*, by engaging in a conspiracy to fix and stabilize the price of CRT Products as described above.

267.   The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as described above, constitute a common, continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of the Sherman Act and (2) violation of the Cartwright Act.

268.   Defendants' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

269.   Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq.*;

270.   Defendants' conduct was carried out, effectuated, and perfected, at least in part, within the state of California.

271.   By reason of the foregoing, Plaintiffs are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

### Fourth Claim for Relief
### (Violation of the New York Donnelly Act)

272.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

64

273.    Plaintiffs are corporations organized and existing under the laws of the State of New York and during the Relevant Period, Plaintiffs and their predecessor entities conducted a substantial volume of business in New York.  In particular, Plaintiffs purchased CRT Products from Defendants and their co-conspirators in New York; maintained warehouses in New York containing CRT Products manufactured and sold by Defendants and co-conspirators; and maintained agents and representatives in New York who sold CRT Products to consumers in New York and elsewhere.  As a result of their presence in New York and the substantial business they conducted in New York, Plaintiffs are entitled to the protection of the laws of New York.

274.    Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995 and continuing thereafter up to and including at least November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of the Donnelly Act, New York General Business Law §§ 340 *et seq.*

275.    Defendants' conspiracy restrained, suppressed and/or eliminated competition in the sale of CRT Products in New York and fixed, raised, maintained and stabilized CRT Products prices in New York at artificially high, non-competitive levels.

276.    As a result, Defendants' conspiracy substantially affected New York commerce

277.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been injured in their business and property by paying more for CRT Products purchased from Defendants, their co-conspirators and others than they would have paid in the absence of

Defendants' combination and conspiracy, and are entitled to relief under New York General Business Law §§ 340 *et seq.*

278.    As a result of Defendants' violation of Section 340 of the New York General Business Law, Plaintiffs are entitled to treble damages and the costs of suit, including attorneys' fees.

### Fifth Claim for Relief
### (Violation of New York Unfair Competition Law)

279.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

280.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs.

281.    The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y General Business Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

282.    Defendants' unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout New York; (2) CRT Products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid supra-competitive, artificially inflated prices for CRT Products.

283.    During the Relevant Period, Defendants' illegal conduct substantially affected New York commerce and consumers.

284.    During the Relevant Period, each of Defendants named herein, directly, or indirectly and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold and/or distributed CRT Products in New York.

285.    Plaintiffs seek treble damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Without prejudice to their contention that Defendants' unlawful conduct was willful and knowing, Plaintiffs do not seek in this action to have those damages trebled pursuant to N.Y. Gen. Bus. Law § 349(h).

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf, adjudging and decreeing that:

A.    Defendants engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the New York Donnelly Act and the unfair competition laws of California and New York and Plaintiffs were injured in their business and property as a result of Defendants' violations;

B.    Plaintiffs shall recover damages sustained by them, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of Plaintiffs shall be entered against Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

C.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, shall be permanently enjoined and

restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

      D.    Plaintiffs shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

      E.    Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

Plaintiffs shall receive such other or further relief as may be just and proper.

## XII.   JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

Dated: February 18, 2011

Philip J. Iovieno
Anne M. Nardacci
Benjamin D. Battles
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY  12207
Telephone:  (518) 434-0600
Facsimile:  (518) 434-0665
Email: piovieno@bsfllp.com
      anardacci@bsfllp.com
      bbattles@bsfllp.com

William Isaacson
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW, Suite 800
Washington, D.C.  20015
Telephone:  (202) 237-2727
Facsimile:  (202) 237-6131
Email:  wisaacson@bsfllp.com

*Counsel for Plaintiffs, Electrograph Systems, Inc. and Electrograph Technologies Corp.*